UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
_____

| | |
|---|---|
| OTAY MESA PROPERTY L.P, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:08-CV-00383 |
| | ) (RMC) |
| | ) |
| U.S. DEPARTMENT OF INTERIOR, et al., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| CENTER FOR BIOLOGICAL DIVERSITY, | ) |
| | ) |
| Movant. | ) |

_____ )

## PLAINTIFFS' OPPOSITION TO MOTION TO INTERVENE

Plaintiffs, Otay Mesa Property L.P., Rancho Vista Del Mar, and Otay International, L.L.C. (collectively "Otay Mesa Plaintiffs"), oppose the Center for Biological Diversity's motion to intervene as a defendant. The Center has neither established associational standing required for intervention (as of right or permissive) in this case, nor satisfied the requirements of Fed. R. Civ. P. 24 (a) or (b).

The Center's motion presents this issue for review:

Plaintiffs' land, which does not contain any habitat for the endangered fairy shrimp, was erroneously designated as such, severely limiting its use. In this record-review case to set aside that erroneous designation the Center for Biological Diversity seeks intervention, even though it knows nothing about the characteristics of Plaintiffs' land, has only generalized interests in fairy shrimp, raises new legal issues and affirmative defenses not asserted by the government, and cannot show that the agency will not adequately defend this lawsuit.  Should intervention nevertheless be granted?

To establish associational standing, the Center relies on the declaration of an employee, David Hogan. Mr. Hogan is the Center's only employee in the Center's San Diego office and the Center puts him forward as a member. Mr. Hogan has alleged no facts sufficient to support his (and thus the Center's) standing to participate as a party in this case. And the Center refuses to produce Mr. Hogan for a telephonic deposition during which he could explain, flesh out, or clarify the facts supporting jurisdiction, injury-in-fact, and redressability for the parties' and the court's benefit.[1]

Mr. Hogan's declaration raises more questions than it answers. For example, the subject property is privately owned and cannot be accessed by public road. The subject property represents only about a third of Subunit 5D (a 391-acre parcel designated by the FWS as fairy shrimp habitat). Yet Mr. Hogan refers to Subunit 5D and the subject property as if they were one and the same, suggesting that he does not know the difference.

Mr. Hogan's declaration also fails to establish that he has even seen the subject property, much less any fairy shrimp on it. He states that he enjoys viewing the fairy shrimp and vernal pools from the Otay truck trail and the overlook on his annual trips to the Otay Mountain Wilderness. But to access the Otay truck trail, which is a federally maintained road used by the Border Patrol, one must get past a locked gate and traverse property also owned by Plaintiffs. The overlook that Mr. Hogan apparently refers to is, at its closest point, 4,200 feet (over ¾ of a mile) away from the boundary of the closest point of the subject property. Due to the terrain, even with the most high-powered binoculars, it would be impossible to see half-

---

[1] Marzulla Decl. ¶3-¶4.

inch long fairy shrimp or vernal pools on the subject property from this overlook, which exist (if ever) only during the wet season, January through March.

Mr. Hogan further fails to allege that he has any specialized training or expertise in the study or protection of fairy shrimp. His declaration does nothing more than establish his strong interest in fairy shrimp in general, and his role in as an activist and advocate for the species.

The issues in the underlying case, in contrast, are very specific. This lawsuit asks the U.S. Fish and Wildlife Service' (FWS) to point to evidence in the administrative record for its decision to include the subject property as fairy shrimp habitat. In responding to Plaintiffs' FOIA request, FWS was unable to do so.   There is no role for the Center or Mr. Hogan in this narrowly framed lawsuit, and no showing that the Federal Defendants cannot adequately represent the Center's interest in this case. As an Administrative Procedures Act (APA) challenge, this case does not challenge the agency's decision to list the fairy shrimp as an endangered species nor does it implicate any policy position of the FWS regarding protection of the fairy shrimp or its habitat.

In short, the Center can add nothing as a party in terms of additional evidence or information to assist the court in its review of the administrative record. A more appropriate role, and a role that the Otay Mesa Plaintiffs would not oppose for the Center, is that of an amicus curiae.

Otherwise, the Center's involvement as a party in this case, raising tangential issues and spurious defenses that cast no light on whether Plaintiffs' property contains fairy shrimp habitat, will serve only to slow down and complicate what is otherwise a

straight-forward record review case that will be resolved through summary judgment on the basis of the administrative record.

**Factual Background**

      The San Diego fairy shrimp are tiny aquatic crustaceans (invertebrates with protective outer shells) that hatch in water, mature, lay eggs, and die, all within a week or two.[2]

> Adult male San Diego fairy shrimp range in length from 9 to 16 mm (0.4 to 0.6 inches (in.)) and the females are 8 to 14 mm (0.4 to 0.5 in.) long. Mature individuals have a delicate elongate body, large stalked compound eyes, nocarapace (shell covering the back), and 11 pairs of swimming legs.[3]

      San Diego fairy shrimp spend their entire life in a single vernal pool, which range in depth from 5 to 30 centimeters (cm) (2 to 12 in.). Fairy shrimp habitat, vernal pools, "can often be difficult to discern during the long, dry months."[4]

> Adult San Diego fairy shrimp are usually observed from January to March; however, in years with early or late rainfall, the hatching period may be extended. The species hatches and matures within 7 days to 2 weeks depending on water temperature….The San Diego fairy shrimp disappear after about a month, but animals will continue to hatch if subsequent rains result in additional water or refilling of the vernal pools. [5]

      According to the FWS, the cumulative loss of vernal pool habitat in San Diego County is estimated at 90 to 97 percent.[6]  Over 40 percent of the vernal pools habitat was destroyed in the Otay Mesa area (where the subject property is located) during the 11-

---

[2] Determination of Endangered Status for the San Diego Fairy Shrimp, 62 Fed. Reg. 4925, 4925-26 (Feb. 3, 1997).
[3] Proposed Rule to List San Diego Fairy Shrimp as Endangered, 59 Fed. Reg. 39874, 39874 (Aug. 4, 1994).
[4] Center's Mot. Intervene at 6.
[5] Determination of Endangered Status for the San Diego Fairy Shrimp, 62 Fed. Reg. at 4926.
[6] *Id.*

year period between 1979 and 1990."[7] About 70 percent of the remaining habitat is on

military bases.[8]

In 1997 the Fish and Wildlife Service added the San Diego fairy shrimp

(*Branchinecta sandiegonensis*) to the list of endangered species,[9] and in 2000 it

designated about 4,000 acres in Orange and San Diego counties, in California, as critical

habitat for the species.[10] That designation did not include any of Plaintiffs' land.[11] The

home building industry challenged that critical habitat designation for failure to perform

an adequate economic impact analysis and, in 2002, FWS sought and received a

voluntary remand of the rule to reconsider its decision.[12]

In 2003 FWS published a new proposed rule to designate about 6,000 acres of

habitat.[13] Unlike the original designation in 2000, the 2003 proposed rule designated

approximately 143 acres of Plaintiffs' land as San Diego fairy shrimp habitat.[14] Plaintiffs

retained an expert in San Diego fairy shrimp habitat to survey their land, and that survey

found no fairy shrimp, no vernal pools and no habitat on the subject property.[15] In their

comment on the proposed rule, therefore, Plaintiffs reported to FWS that its mapping of

critical habitat to include their land was "flawed and/or inaccurate."[16]

The final rule, published in December, 2007, nevertheless designated

approximately 143 acres of Plaintiffs' land as critical habitat for the San Diego fairy

---

[7] *Id.*

[8] *Id.* at 4929.

[9] Determination of Endangered Status for the San Diego Fairy Shrimp, 62 Fed. Reg. 4925.

[10] Final Determination of Critical Habitat for the San Diego Fairy Shrimp, 65 Fed. Reg. 63438 (Oct. 23, 2000).

[11] *Id.*

[12] Designation of Critical Habitat for the San Diego Fairy Shrimp, 72 Fed. Reg. 70648, 70649 (Dec. 12, 2007).

[13] Designation of Critical Habitat for the San Diego Fairy Shrimp, 68 Fed. Reg. 19888 (Apr. 22, 2003).

[14] *Id.* at 19899-19900.

[15] Wick Decl. at ¶7.

[16] *Id.* at ¶8.

shrimp without explaining why.[17]  In an effort to get to the bottom of this designation, which they believed to be erroneous, Plaintiffs opened discussions with FWS officials and, at FWS's suggestion, submitted a Freedom of Information Act request for all such evidence indicating the presence of fairy shrimp habitat on their property.[18]  Although FWS provided a CD of data, none of it demonstrated that there were San Diego fairy shrimp or vernal pools on the subject property.[19]  Satisfied that their land had been erroneously designated, Plaintiffs filed this suit.[20]

The subject property is located along the United States-Mexican border in San Diego County, east of the city of San Diego, in a rugged and hilly coastal-mesa area, lying west of the foothills of the San Ysidro Mountains.  Most of the area is accessible only in heavy-duty utility vehicles or on horseback.[21] The subject property is privately owned, unimproved but zoned for light industrial use.  Plaintiffs together own approximately 274.55 acres, approximately 143 acres of which have been designated by the FWS as habitat for the San Diego fairy shrimp.  These 143 acres are included in a 391-acre parcel that the FWS refers to as Subunit 5D, a parcel designated by the FWS as fairy shrimp habitat.[22]

David Hogan alleges in his declaration that he has "traveled many times to Critical Habitat [Sub]Unit 5D in the past and I intend to return to that critical habitat as part of my regular [annual] visits to the Otay Mountain Wilderness via Otay Mountain road, a.k.a. Otay Mountain Truck trail."[23] David Hogan goes on to state that "[p]ortions

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] Wick Decl. at ¶5.
[22] *See* Wick Decl. Ex. 1.
[23] Hogan Decl. at ¶8.

of Critical Habitat [Sub]Unit 5D are accessible via roads open to the public, and I often

stop at a prominent vista overlooking Critical Habitat [Sub]Unit 5D on my trips to and

from the Otay Mountain Wilderness."[24]

The subject property, however, and indeed the entire Subunit 5D, is not accessible

by public roads.[25]  The Otay Truck Trail is also located approximately 1 mile from the

northern most boundary of the subject property and several miles from the interior of the

subject property.[26]  Because of the terrain, a person standing on the overlook, even using

binoculars, could not view fairy shrimp or vernal pools on the subject property.[27]  And

the Otay truck trail is not a publicly maintained or publicly dedicated road; it can be

legally accessed only via a locked gate located on private land owned by the Otay Mesa

Plaintiffs.[28]  The Plaintiffs have never given Mr. Hogan or anyone at the Center

permission to enter their land. The only way Mr. Hogan could access the Otay truck trail

is to trespass on land owned by the Otay Mesa Plaintiffs.[29]

Mr. Hogan's declaration also contains no allegations that he has had any

specialized training or expertise in the study or protection of fairy shrimp. Rather,

his allegations describe his work as an activist and advocate in favor of fairy shrimp

protection, serving as the Center's petitioner in litigation and in "writing, posting,

and disseminating via [the] internet and mail outreach systems educational pieces

concerning the plight of the San Diego fairy shrimp; and orally and in writing

before various federal and state agencies for the protection of this species."[30]

---

[24] *Id.*
[25] Wick Decl. at ¶5.
[26] *See* Wick Decl. Ex. 1.
[27] Wick Decl. ¶6.
[28] *Id.*
[29] Wick Decl. ¶5.
[30] Hogan Decl. ¶5.

In his background statement on the Center's web site he is identified as a Conservation Manager for the Center, and the only employee in San Diego office of the Arizona-based organization.[31]  The web site further states that he "specializes in southern California national forests and the improvement of regional habitat conservation plans."[32]  His work before joining the Center was devoted to protecting the California gnatcatcher. In 2006 the San Diego Sierra Club reportedly gave him its "Community Activist" Award.[33]

**Procedural Background**

The Otay Mesa Plaintiffs filed their complaint in this case on March 3, 2008. The Federal Defendants Answered on May 2, 2008.  The parties conferred on June 2, 2008 as required by Local Rule 16.3.  The Center for Biological Diversity filed a motion to intervene on May 20, 2008.  The Federal Defendants filed a motion to transfer venue on June 2, 2008.  Responsive briefs are being prepared for both motions.

The Court has scheduled a status conference with the parties on June 23, 2008.

**Argument**

**1.    The Center Is Not Entitled to Intervene as of Right in this Case**

Fed. R. Civ. P. 24 (a) provides that "[o]n timely motion, the court must permit anyone to intervene who . . . .

> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical  matter impair or impede the movant's ability to protect that interest, unless existing parties adequately represent that interest.

---

[31] The Center for Biological Diversity Website, Meet the Staff, *available at* http://www.biologicaldiversity.org/about/staff/index.html (last visited June 9, 2008).

[32] *Id.*

[33] *Id.*

In addition to timeliness, "Rule 24(a) contains three prerequisites for intervention as of right: there must be an adequate interest, a possible impairment of that interest and a lack of adequate representation of that interest by existing parties."[34] The D.C. Circuit has further held that because an intervenor participates on equal footing with original parties in a lawsuit, an intervenor-applicant must satisfy the same Article III standing requirements as the original parties.[35] To qualify for Article III standing, the applicant must "identify a concrete and particularized injury in fact, establish a causal connection between the injury and the alleged conduct, and prove that a decision in the party's favor would redress the injury."[36] This injury must also be "actual or imminent, not 'conjectural' or 'hypothetical.'"[37] The burden of proving standing falls squarely on the intervenor-applicant.[38]

### A. The Center has Failed to Demonstrate Article III Standing for itself or its Purported Employee-Member, David Hogan

As the Center correctly states, to succeed in this Motion to Intervene the Center "[M]ust demonstrate that it has standing."[39] A long-standing interest in protection of endangered species such as the San Diego fairy shrimp is not sufficient to confer such standing. The Supreme Court made this clear in its seminal case on standing:

> The Sierra Club is a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations. But if a 'special interest' in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization however small or short-lived. And if any group with a bona fide 'special interest' could

---

[34] *Dimond v. District of Columbia,* 792 F.2d 179, 193 (D.C. Cir. 1985).
[35] *Building and Constr. Trade Dept. v. Reich,* 40 F.3d 1275, 1282 (D.C. Cir. 1994).
[36] *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).
[37] *Id.*
[38] *Id.* at 560-61.
[39] Center's Mot. Intervene at 14.

> initiate such litigation, it is difficult to perceive why any individual citizen
> with the same bona fide special interest would not also be entitled to do
> so.[40]

The Supreme Court has further made clear that even a genuine interest in animals is thus
insufficient to confer standing:

> It is unclear to us what constitutes a "genuine" interest; how it differs from
> a "nongenuine" interest (which nonetheless prompted a plaintiff to file
> suit); and why such an interest in animals should be different from such an
> interest in anything else that is the subject of a lawsuit.[41]

To demonstrate Article III standing in this case, the Center must establish three
elements: (1) that it has suffered an "injury in fact"-an invasion of a legally-protected
interest which is (a) concrete and particularized, and (b) "actual or imminent, not
'conjectural' or 'hypothetical,' " (2) that its injury is fairly traceable to the challenged
action of the defendant, and not the result of the "independent action of some third party
not before the court;" and (3) that it is "likely" as opposed to merely "speculative" that
the plaintiff's injury will be "redressed by a favorable decision."[42]  As the party invoking
federal jurisdiction, the Center "bears the burden of establishing these elements." [43]

Since it is a membership association, the Center may predicate its standing on
particularized injury to members of the organization.[44]  Although the Center claims to
have 40,000 members, in this case the Center has chosen to rest its entire standing claim
on the alleged injury-in-fact to one individual:  David Hogan.  Because Mr. Hogan has
never visited the subject property (and cannot do so without trespassing), has never
observed fairy shrimp or vernal pools on the subject property (because there are none)

---

[40] *Sierra Club v. Morton*, 405 U.S. 727, 739-740 (1972).

[41] *Lujan*, 504 U.S. 555, 567 (1992).

[42] *Lujan*, 504 U.S. at 560–61, *quoted in Basel Action Network v. Maritime Admin.*, 370 F.Supp.2d 57, 66 (D.D.C. 2005).

[43] *Lujan*, 504 U.S. at 561.

[44] *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 342 (1977).

and because he is an employee who does not exhibit the indicia of true membership, Mr.

Hogan (and therefore the Center) lack standing in this case.

Mr. Hogan's standing (and therefore the Center's) is precluded by the Supreme

Court's holding in *Lujan v. Defenders of Wildlife*[45], which rejected an environmental

group's claim of standing to sue to halt U.S. funding of the construction of a dam in

Egypt that would inundate the habitat of endangered Nile crocodiles, and a dam in Sri-

Lanka which would destroy the habitat of endangered Asian elephants and leopards.  In

support of its standing, Defenders of Wildlife offered the affidavits of two of its members

who had visited the sites of both dams to observe the endangered Nile crocodiles, Asian

elephants and leopards, and intended to return to again observe those species:

> We shall assume for the sake of argument that these affidavits contain
> facts showing that certain agency-funded projects threaten listed species. .
> . .They plainly contain no facts, however, showing how damage to the
> species will produce "imminent" injury to Mses. Kelly and Skilbred.  That
> the women "had visited" the areas of the projects before the projects
> commenced proves nothing. . . .And the affiants' profession of an
> "inten[t]" to return to the places they had visited before-where they will
> presumably, this time, be deprived of the opportunity to observe animals
> of the endangered species-is simply not enough."[46]

David Hogan's declaration falls far short even of the inadequate facts in the *Lujan*

affidavits, which at least alleged that the members of Defenders of Wildlife had traveled

to the site and viewed the endangered animals, and intended to return.  In contrast, Mr.

Hogan does not allege that he has ever come closer than a mile of the subject property, let

alone seen fairy shrimp or vernal pools on it.  The most Mr. Hogan can say is that once a

year he drives on the Otay Truck Trail where he stops at an overlook about a mile from

the subject property to view the surrounding countryside:

---

[45] *Lujan,* 504 U.S. 555.
[46] *Id.* at 564.

> I often stop at a prominent vista overlooking Critical Habitat Unit 5D on my trips to and from the Otay Mountain Wilderness. My visits to the Otay Mountain Wilderness via Critical Habitat Unit 5D occur, approximately, on an annual basis.[47]

This is not surprising, since the subject property is not (contrary to Mr. Hogan's declaration) accessible by public road,[48] and he would have to trespass to reach it:

> Mr. Hogan could not have accessed the subject property via the Otay truck trail or any public road, as no public road provides access to it.  This area can only be reached by heavy duty utility vehicle or horseback as there is no public road leading to it.   Plaintiffs have never given Mr. Hogan nor any other representative of the Center for Biological Diversity ("CBD") permission to enter their land and, to the best of my knowledge, neither Mr. Hogan nor any CBD representative has ever done so.  The only way Mr. Hogan could access the Otay truck trail is to trespass on land owned by Plaintiffs and managed by me.[49]

Thus, the fact that Mr. Hogan has visited other fairy shrimp sites or traveled within a mile of the subject property is insufficient to provide standing.  As the Lujan court noted, "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly "in the vicinity" of it."[50]

Nor can Mr. Hogan even claim that there are fairy shrimp or vernal pools on the subject property for him to observe.  Last year Plaintiffs had an expert fairy shrimp habitat survey performed, and it found nothing on the subject property.[51]  Plaintiffs also submitted a FOIA request to FWS, which also turned up no evidence of fairy shrimp habitat on the subject property.[52]

Because the vernal pools (essentially puddles) in which the fairy shrimp hatch, breed and die, last only a few weeks each year, Mr. Hogan's once-a-year visit to the Otay

---

[47] Hogan Decl. ¶8.
[48] *See* Wick Decl. Ex. 1.
[49] Wick Decl. ¶5.
[50] *Lujan,* 504 U.S. at 565.
[51] Wick Decl. ¶7.
[52] Wick Decl. ¶8.

Mountain Wilderness (he does not specify at what time of year) is unlikely to be at a time when the vernal pools are visible.  As the Center describes them, vernal pools are "shallow depressions on hard clay mesas of southwestern California and northwestern Baja California…. Vernal pools contain water in the short winter months, but can often be difficult to discern during the long dry months."[53]

Finally, the fact that Mr. Hogan's job involves advocacy for endangered species,[54] including the fairy shrimp, is insufficient to afford him standing, as the Supreme Court has directly rejected this "vocational nexus" theory of standing:

> Respondents other theories are called, alas, the "animal nexus" approach, whereby anyone who has an interest in studying or seeing the endangered animals anywhere on the globe has standing; and the "vocational nexus" approach, under which anyone with a professional interest in such animals can sue. Under these theories, anyone who goes to see Asian elephants in the Bronx Zoo, and anyone who is a keeper of Asian elephants in the Bronx Zoo, has standing to sue because the Director of the Agency for International Development (AID) did not consult with the Secretary regarding the AID-funded project in Sri Lanka. This is beyond all reason. Standing is not "an ingenious academic exercise in the conceivable."[55]

## B.    The Center Lacks a Legally Protected Interest in the Property or Transaction which is the Subject Matter of this Case, Plaintiffs' Land

Rule 24(a)(2) requires that an intervener possess "an interest relating to the property or transaction that is the subject of the action, and [that the applicant] is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest."  The D.C. Circuit has held that the intervener's interest must be a legally protectable one, similar to the injury-in-fact requirement for Article III standing. In *Donaldson v. United State,* the court states that "[T]he rule impliedly refers not to *any*

---

[53] Center's Mot. Intervene at 6.
[54] Hogan Decl. ¶4.
[55] *Lujan*, 504 U.S. at 566 (citation omitted).

interest the applicant can put forward, but only to a legally protectable one."[56] Such a gloss upon the rule is in any case required by Article III of the Constitution.[57]

In *Donaldson v. United States,* the Supreme Court denied intervention to a taxpayer who sought to intervene to block IRS from obtaining financial records from Donaldson's business associates that would shed light on the accuracy of Donaldson's tax returns.[58] Recognizing that the taxpayer had a significant personal stake in the IRS probe, the Court nevertheless found that Donaldson's strong personal interest did not rise to the level of a legally protected interest in the property or transaction:

> Donaldson's only interest-and of course it looms large in his eyes-lies in the fact that those records presumably contain details of Acme-to-Donaldson payments possessing significance for federal income tax purposes. . . .This interest cannot be the kind contemplated by Rule 24(a)(2) when it speaks in general terms of 'an interest relating to the property or transaction which is the subject of the action.'  What is obviously meant there is a significantly protectable interest.[59]

The Center lacks a legally cognizable interest which will be impaired or impeded in this case for essentially the same reasons it lacks Article III standing.  First, the subject property is private, inaccessible except by trespassing using heavy duty vehicles or horseback—which the Center and its employees and members have no right to do.[60] Second, the Center has provided no evidence that there are any fairy shrimp or vernal pools on the subject property to be observed or studied.[61]  Third, the Center has not identified any scientific work regarding the fairy shrimp which it has undertaken, nor has

---

[56] 400 U.S. 517, 531 (1971) (applicant must demonstrate "significantly protectable interest"), *superceded by statute on a separate point of law.*
[57] *City of Cleveland, Ohio v. Nuclear Regulatory Com'n.,* 17 F.3d 1515, 1517 (D.C. Cir. 1994);  *See also Southern Christian Leadership Conference v. Kelley,* 747 F.2d 777, 779 (D.C. Cir. 1984) (holding that a United States Senator lacks a legally protectable interest in obtaining access to FBI tapes of the conversations of Dr. Martin Luther King, Jr.)
[58] 400 U.S. at 531.
[59] *Id.*
[60] Wick Decl. ¶5.
[61] Wick Decl. ¶7.

it identified anyone on staff (including Mr. Hogan) who has the credentials to scientifically study the fairy shrimp.

Fourth, contrary to its suggestion, the Center was not involved in the suit which gave rise to the FWS rule designating 143 acres of Plaintiffs' property as fairy shrimp habitat without any evidence of fairy shrimp or vernal pools on the property. That suit, originally titled *Building Industry Association v. Norton,* Civ. No. 01-0079, filed in this Court, was transferred and resolved with the related case of *NRDC v. United States Department of the Interior*[62]*,* in which FWS sought and received the voluntary remand which eventuated in the December 12, 2007 rule at issue in this case.

Finally, this Court's resolution of this APA case cannot affect any legal right of the Center. Resolution of the case turns entirely on whether the administrative record does or does not contain evidence that fairy shrimp or vernal pools are present on the subject property, affecting Plaintiffs' legal rights to use the property but not impacting any legal right of the Center. The Center's advocacy interest in fairy shrimp and other endangered species, like the interest of Sen. Helms in obtaining information to help him make legislative decisions regarding Dr. King[63], is not a legal right and thus does not satisfy the requirement of Rule 24(a)(2) which allows intervention only for parties possessing such a legally protected right.

---

[62] 275 F.Supp.2d 1136 (C.D. Cal. 2002).

[63] *Southern Christian Leadership Conference v. Kelley,* 747 F.2d at 780-81.

**C.    The Center's Interests are Adequately Represented by the Federal Defendants**

As Rule 24(a)(2) provides, intervention is precluded if "the applicant's interest is adequately represented by existing parties." The movant bears the burden of proving inadequacy of representation under Rule 24(a)(2).[64]

When a party thus seeks to intervene as a defendant in a lawsuit against government agencies, "representation is presumed adequate, and the movant must demonstrate the existence of 'special circumstances.'"[65] To overcome this presumption, the movant must make a concrete showing of circumstances in the case that makes the government's representation inadequate.[66] As this Court has also noted, "while interests may differ in scope, intervention is only justified in situations where . . . the government's interest representative of the individual claims is actually adverse to those claims."[67]

In cases where the intervenor-applicant's arguments would duplicate that of the government defendant, the court has refused to grant intervention. For example, in *Natural Resources Defense Council v. Costle*, the court denied a Utah utility company's application to intervene in a dispute involved the adequacy of the salinity standards promulgated by States.[68] The issue was whether the Environmental Protection Agency (EPA) Administrator had fulfilled his statutory duty in approving the salinity plans for the Colorado River, and the parties were limited to arguing for or against the validity of

---

[64] *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n. 10 (1972); *Environmental Defense Fund v. Costle*, 79 F.R.D. 235, 239 (D.C. Cir. 1978).

[65] *Environmental Defense Fund,* 79 F.R.D. at 241(citations omitted).  *See also Environmental Defense Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979)(intervenor-applicant must demonstrate that its interest is different from the government's).

[66] *See also* CHARLES ALAN WRIGHT, ARTHUR MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §1909 (3d ed. 2008).

[67] *Environmental Defense Fund v. Thomas,* 1985 WL 6050, at *5 (D.D.C. Dec. 10, 1991).

[68] *Natural Resources Defense Council v. Costle*, 79 F.R.D. 235, 243 (D.C. D. C. 1978).

the regulations. The court denied Utah utility intervention because its arguments would

have been cumulative and thus irrelevant:

> This case deals only with the adequacy of the salinity standards promulgated by the states and whether the Administrator fulfilled his statutory duty in approving these plans. As such, the parties are limited to arguing for or against the validity of these regulations. Individual interests such as those [the utility] seeks to advance are largely irrelevant. [The utlity]'s arguments directed at the subject matter of this case will be cumulative of the arguments advanced by the other defendants.[69]

In this case, the Center argues that the Federal Defendants will not adequately

represent their interests because the FWS has failed to take the steps that the Center

advocated earlier in the fairy shrimp listing process and in other litigation involving the

issuance of an incidental take permit.[70] The Center implies that the Federal Defendants

will not defend this case with the same vigor as it will. To support intervention, however,

a movant must demonstrate that its involvement will make a difference in the case, not

merely assert that it will bring more vigor to the defense. In *Humane Society v. United

States v. Clark,* the Court concluded that the movants had "failed to make any showing

whatsoever that any difference exists between their interest and that of the government in

seeing the challenged actions upheld."[71] More specifically, the Court rejected movants'

"vigor" argument, pointing out that, "[i]n the context of this lawsuit, the federal

defendants' only interest is in upholding the regulations." [72]

Likewise, here, the Federal Defendants' only interest lies in upholding its

regulation designating the subject property as fairy shrimp habitat. To do so, the

government must point to factual evidence in the record that fairy shrimp or vernal pools

---

[69] *Id.* at 242-43.
[70] *See* Center's Mot. Intervene at 21-23.
[71] 109 F.R.D. 518, 520 (D.D.C. 1985), *quoted with approval in Sweet Home Chapter of Communities for Greater Oregon v. Lujan,* 1991 WL 277331, at *3 (D.D.C. 1991).
[72] *Id.*

are, in fact, found on Plaintiffs' land. The Center and its sole employee-member representative, Mr. Hogan, assert no factual knowledge or expertise regarding the existence of these creatures or their habitat (vernal pools) on Plaintiffs' land and, in fact, demonstrate no knowledge at all about Plaintiffs' 143 acres of designated fairy shrimp habitat. Thus, allowing the Center to intervene would be duplicative and would not promote judicial economy.

The Center further suggests that the parties could enter into a settlement that "is contrary to the purposes of the ESA, illegal, or unreasonable."[73] Short of questioning the integrity or legal competence of the Justice Department and the Fish and Wildlife Service, however, the Center offers no specifics to support this extraordinary charge. This case is a record-review case, however. There are no environmental policies at issue and no discretionary decision-making for the agency to engage in. There is also no possible settlement that the parties could enter into – either the record supports the habitat designation or it does not.

The Center's participation as a party defendant thus would be duplicative of what the Federal Defendants will argue. Indeed, the Center and the Federal Defendants submitted virtually identical Answers. Both the Center and Federal Defendants denied the same allegations in the complaint, admitted the same allegations in the complaint, identified the same allegations as calling for a legal conclusion, and identified the same allegations that they lacked sufficient information to admit or deny. The Center and the

---

[73] Center's Mot. Intervene at 22.

Federal Defendants rely on the same documents prepared by the U.S. Fish and Wildlife Service in denying many of the complaint's allegations.[74]

Finally, neither of the two cases apply that the Center relies on in support of its argument that the Federal Defendants cannot adequately represent their interests. *Dimond v. District of Columbia*, involved a intervenor-applicant that had a financial stake in the outcome of the case, which the court believed the District would not adequately represent.[75] And in *Forest Conservation Council v. United States Forest Service*, the intervenor-applicants had an interest in defending against the issuance of an injunction, an obligation not encompassed within the Forest Service's statutory obligations.[76]

## II.    This Court Should Not Grant the Center Permissive Intervention

Permissive intervention may be permitted under Rule 24 (b)(1) if the movant "has a claim or defense that shares with the main action a common question of law or fact." "The decision to grant or deny [permissive] intervention is discretionary, subject to considerations of equity and judicial economy."[77] As Rule 24 (b)(3) states, "[i]n exercising its discretion the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."

In order to intervene under Rule 24 (b)(1), the movant must, however, also demonstrate that it has an independent ground for subject matter jurisdiction.[78] Here, this Court should not exercise its discretion to allow the Center to intervene permissively

---

[74] *See Building and Construction Trades Dept., AFL-CIO v. Reich,* 40 F.3d 1275, 1282 (D.C. Cir. 1994) (denying intervenor-applicant's Motion to Intervene when movant offered no argument not also pressed by the government).
[75] 792 F.2d 179, 192-193 (D.C. Cir. 1986).
[76] 66 F.3d 1489, 1499 (9th Cir. 1985).
[77] *Garza v. County of Los Angeles*, 918 F.2d 763, 777 (9th Cir. 1990).
[78] *Equal Employment Opportunity Comm'n v. Nat'l Children's Center*, 146 F.3d 1042 (D.C. Cir. 1998). *But see Vitamins Antitrust Class Actions*, 215 F.3d 26, 31 (D.C. Cir. 2000) (stating that "there is uncertainty over whether standing is necessary for permissive intervention.")

because the Center has not demonstrated that it has standing to participate as a party in this case.[79]

In its motion, the Center reveals that its plans for defending this case involve raising broad-ranging policy questions that have nothing to do with the limited question of whether there are fairy shrimp or vernal pools on Plaintiffs' land. The Center argues that it will "address the exact matters raised by the Plaintiffs having to do with the necessity for protection of San Diego vernal pool habitat under the Endangered Species Act."[80] This case, of course, has nothing to do with the necessity for protecting vernal pools under the ESA and everything to do with the evidence in the administrative record for designating the subject property as habitat.

The Center further reveals that its interests in this case far exceeds what is at issue in this record-review case. The Center talks about its interest in the "full enforcement of federal laws for the protection for the San Diego fairy shrimp . . . the Center continues to raise common questions of law related to the Endangered Species Act as it relates to the common questions of fact in protection of the San Diego fairy shrimp."[81] The Center's interest in enforcing the ESA and protecting the fairy shrimp are irrelevant to the issue of whether the administrative record supports the conclusion that the subject property contains fairy shrimp and vernal pools.

Thus, the Center's interests go far beyond issues of law and fact raised by the parties in this case, and are not in common with the narrow issue before the court. And the Center relies on nothing but the administrative record for its proposed Answer, and its proposed Answer is virtually identical to the Answer filed by the Federal Defendants.

---

[79] *See supra* pp. 9-13.
[80] Center's Mot. Intervene at 24.
[81] *Id.*

Thus, the Center's participation in this case will only serve to complicate and delay what is otherwise a straight-forward record-review case.

This point is further illustrated by the Center's inclusion of two irrelevant affirmative defenses in its Answer, Nos. 2 and 3, which the government appropriately did not raise.[82] Both of these defenses relate exclusively to actions brought under the Endangered Species Act, not the Administrative Procedures Act. Thus, these affirmative defenses are patently without merit, but the court and the parties will have to address them if the Center is allowed to intervene as a party defendant.

As the Fifth Circuit has observed, a third-party can usually contribute most effectively and efficiently as an amicus curiae:

> It is easy enough to see what are the arguments against intervention where, as here, the intervenor merely underlines issues of law already raised by the primary parties. Additional parties always take more time. Even if they have no witnesses of their own, they are the source of additional questions, briefs, arguments, motions and the like which tend to make the proceedings a Donnybrook Fair. Where he presents no new questions, a third party can contribute usually most effectively and always more expeditiously be a brief amicus curiae and not be intervention.[83]

The Otay Mesa Plaintiffs would not oppose the Center's participation as an amicus curiae in this case.

**Conclusion**

For all of these reasons, the Otay Mesa Plaintiffs oppose the Center's intervention in this case.

---

[82] Center's Proposed Answer Compl. at 5.
[83] *Bush v. Viterna*, 740 F.2d 350, 359 (5th Cir. 1984).

Respectfully submitted,


/s/Nancie G. Marzulla_____
Nancie G. Marzulla, D.C. Bar No. 400985
Roger J. Marzulla, D.C. Bar No. 394907
Marzulla Law
1350 Connecticut Avenue, NW
Suite 410
Washington, DC  20036
(202) 822-6760
(202) 822-6774 (facsimile)

June 9, 2008                          Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| OTAY MESA PROPERTY L.P., ) <br> a California limited partnership; ) <br> RANCHO VISTA DEL MAR, ) <br> a California corporation, ) <br> and OTAY INTERNATIONAL, LLC, ) <br> a California limited liability company, ) <br>                 ) <br>       Plaintiffs, ) <br>                 ) <br> v. ) <br>                 ) <br> UNITED STATES DEPARTMENT OF ) <br> THE INTERIOR, ) <br> UNITED STATES FISH ) <br> AND WILDLIFE SERVICE, ) <br> DIRK KEMPTHORNE, in his official ) <br> capacity as Secretary of the ) <br> Department of the Interior, ) <br> LYLE LAVERTY, in his official capacity ) <br> as Assistant Secretary for Fish, Wildlife ) <br> and Parks, Department of the Interior, ) <br>                 ) <br>       Defendants. ) | Case No. 1:08-cv-00383 |

_____)

## DECLARATION OF ROGER J. MARZULLA

I, Roger J. Marzulla, pursuant to 28 U.S.C. § 1746, declare:

1.  I am one of the attorneys for Plaintiffs, Otay Mesa Property, L.P., Rancho Vista Del Mar, and Otay International, LLC.

2.  On June 2, 2008 my partner, Nancie Marzulla, e-mailed to Johnathan Evans, attorney for the Center for Biological Diversity, a Notice of Deposition for David Hogan. Her e-mail read in part: "We would like to take a short (an hour or less) deposition for jurisdictional purposes only. I propose that we take the deposition telephonically, to minimize any hardship for Mr. Hogan. I have also proposed that we take the deposition

this Wednesday, but I am open to another date if that would be more convenient for Mr.

Hogan or you.  Please let me know. Also, please feel free to call me if you wish to

discuss. Thanks, Nancie."  A copy of this e-mail, with the attached Notice of Deposition,

is attached as Exhibit 1.

3.   On June 3, 2008, Mr. Evans responded by e-mail, stating:  "After consultation

with Mr. Hogan and Mr. Senatore, the attorney of record for the case, we are unable to

make Mr. Hogan available for the deposition."  See Exhibit 1.

4.   Later that day I spoke by telephone with Mr. Evans. I told Mr. Evans that we

wished to take Mr. Hogan's deposition with respect to a number of factual issues raised

by the declaration he filed in support of the Center's Motion to Intervene.  I offered to

take the deposition at any time or place convenient to Mr. Hogan and his attorney.  Mr.

Evans stated that the e-mail represents the Center's position that it will not allow Mr.

Hogan's deposition to be taken at any time nor upon any terms.

5.   In that conversation I also told Mr. Evans that one issue we are concerned about is

the fact that Mr. Hogan, an employee of the Center, also claims to be a member.  I told

him that we wished to ask Mr. Hogan whether he paid membership dues, filled out a

membership application, or held a membership card.  Mr. Evans stated that all employees

of the Center are considered members as a matter of policy.  He refused to confirm

whether Mr. Hogan paid membership dues or whether Mr. Hogan held the same kind of

membership that one might obtain by signing up on the Center's web site.

6.   I also told Mr. Evans that we wished to inquire into the number of occasions and

the method by which Mr. Hogan might observe or study fairy shrimp on Plaintiffs' land,

since the land is private and not accessible by public road) and how the outcome of this

case could possibly affect Mr. Hogan's study of fairy shrimp one way or the other.  I also

told him that we wished to see Mr. Hogan's biography, as his Declaration told us nothing

of his education, training or experience.  Mr. Evans refused to provide any such

documents or information, and repeated that Mr. Hogan's deposition would not be taken.

I declare the foregoing to be true and correct under penalty of perjury as provided

in 28 U.S.C. § 1746.

<div style="margin-left:40%">

/s/Roger J. Marzulla            
Roger J. Marzulla, D.C. Bar No. 394907
Marzulla Law
1350 Connecticut Avenue, NW
Suite 410
Washington, DC 20036
(202)822-6760
(202)822-6774 (facsimile)

</div>

Executed this 9th day of June, 2008.

Exhibit 1

Civ. No. 1:08-cv-00383-(RMC)

**From:** Jonathan Evans [mailto:jevans@biologicaldiversity.org]
**Sent:** Tuesday, June 03, 2008 11:41 AM
**To:** Nancie Marzulla
**Cc:** 'Michael Senatore'
**Subject:** RE: Notice of deposition

Dear Ms. Marzulla:

Thank you for your messages.  After consultation with Mr. Hogan and Mr. Senatore, the attorney of record for the case, we are unable to make Mr. Hogan available for the deposition.

Sincerely,

Jonathan Evans
Staff Attorney
Center for Biological Diversity
PMB 447, 8033 Sunset Blvd.
Los Angeles, CA. 90046
(213) 598-1466
Fax: (213) 652-1940

www.biologicaldiversity.org

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

---

**From:** Nancie Marzulla [mailto:nancie@marzulla.com]
**Sent:** Monday, June 02, 2008 1:34 PM
**To:** jevans@biologicaldiversity.org
**Subject:** Notice of deposition

Dear Jonathan—Attached is a notice of deposition for David Hogan.  We would like to take a short (an hour or less) deposition for jurisdictional purposes only.  I propose that we take the deposition telephonically, to minimize any hardship for Mr. Hogan.  I have also proposed that we take the deposition this Wednesday, but I am open to another date if that would be more convenient for Mr. Hogan or you.  Please let me know. Also, please feel free to call me if you wish to discuss. Thanks, Nancie

=========================================
This e-mail is intended only for use by the individual or entity to whom it is addressed.  It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law.  If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or its contents is strictly prohibited.  If you have received this transmission in error, please return the original transmission.
=========================================

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| OTAY MESA PROPERTY L.P., et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | Civil Action No. 08-383 (RMC) |
| v. | ) | |
| | ) | |
| U.S. DEPT. OF THE INTERIOR, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**NOTICE OF DEPOSITION OF DAVID HOGAN**

Please take notice that under FED. R. CIV. P. 30(b)(4), Plaintiffs, Otay Mesa Property L.P. et al., will take the deposition upon oral examination of David Hogan. The deposition will commence at 10:00 a.m. Pacific Time, on Wednesday, June 4, 2008, to be taken telephonically at the office of Shelburne Sherr Court Reporters, 501 West Broadway, Suite 1330, San Diego, CA. The testimony will be recorded by stenographic means before an officer authorized by law to take depositions in California. The deposition is being taken for the purpose of discovery, for use at hearing or conference, or for other such purposes as are permitted under the Federal Rules of Civil Procedure.

Under FED. R. CIV. P. 34, the deponent is requested to bring with him all files and documents (including but not limited to electronic, handwritten or typewritten notes, reports, tabulations, summaries, analyses, studies, correspondence, drafts, telephone messages, memos, electronic mail messages, photographs, and recordings) that summarize, memorialize, describe, relate in any way to:

1.  David Hogan's job description at the Center for Biological Diversity;

2.  David Hogan's curriculum vitae or resume;

3.  Evidence of David Hogan's membership in the Center for Biological Diversity,

    including, but not limited to, membership cards, applications, correspondence,

    cancelled checks for payment of membership dues, etc.;

4.  Notes, photographs, or reports of any kind relating to David Hogan's visits to the

    subject property designated as Unit 5D;

5.  Trip reports or expense reports relating to David Hogan's visits to the subject
    property designated as Unit 5D.

 

 

_____

Nancie G. Marzulla, D.C. Bar No. 400985
MARZULLA & MARZULLA
1350 Connecticut Avenue, NW
Suite 410
Washington, DC  20036
(202) 822-6760
(202) 822-6774 (facsimile)

June 2, 2008                                    Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| OTAY MESA PROPERTY L.P., a California limited partnership; RANCHO VISTA DEL MAR, a California corporation, and OTAY INTERNATIONAL, LLC, a California limited liability company, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:08-cv-00383 |
| v. | ) ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE, DIRK KEMPTHORNE, in his official capacity as Secretary of the Department of the Interior, LYLE LAVERTY, in his official capacity as Assistant Secretary for Fish, Wildlife and Parks, Department of the Interior, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF DAVID WICK

I, David Wick, pursuant to 28 U.S.C. § 1746, declare:

1. I am, and have been since 1992, an employee of S.D. Commercial, LLC, a California corporation, or its predecessor, a California property management company, with its principal place of business located at 5440 Morehouse Drive, Suite 4000, San Diego, California 92121. Throughout that time, I have been the person primarily responsible for the management of all of the property owned by Plaintiffs, Otay Mesa Property L.P., Rancho Vista Del Mar, and Otay International, LLC, including the land that has been designated "Critical Habitat" for the endangered fairy shrimp. I am

intimately familiar with the physical characteristics, history, topography, and development of the subject property since 1992, and I can personally testify to the facts set forth in this declaration.

2. Since 1992, I have visited the subject property, together with other properties I manage, on average about once a week in connection with my duties. The subject property consists of three parcels:

- A parcel owned by Otay Mesa Property, L.P., outlined in yellow on the map attached as Exhibit 1, approximately 56 acres of which has been designated as critical habitat for the endangered fairy shrimp;

- A parcel owned by Rancho Vista Del Mar, outlined in purple on the map attached as Exhibit 1, approximately 44 acres of which has been designated as critical habitat for the endangered fairy shrimp;

- A parcel owned by Otay International, LLC, outline in brown on the map attached as Exhibit 1, approximately 43 acres of which has been designated as critical habitat for the endangered fairy shrimp.

3. The map attached as Exhibit 1 accurately depicts these parcels, the area erroneously designated as fairy shrimp habitat, and the surrounding roads and other features. The area designated as Critical Habitat is outlined and labeled in red. The parcel of land owned by Plaintiff Otay Mesa Property, L.P., approximately 56 acres of which lie within the boundary of the Critical Habitat, is outlined in yellow. The parcels of land owned by Plaintiff Rancho Vista Del Mar, approximately 44 acres of which lie within the boundary of the Critical Habitat, is outlined in purple. The parcels of land owned by Plaintiff Otay International LLC, approximately 43 acres of which lie within

2

the boundary of the Critical Habitat, is outlined in brown. One arrow on the map

measures the distance from the intersection of two local public roads, Alta Road and Otay

Mesa Road, and the nearest concurrence of Plaintiffs' private property and the Critical

Habitat; a distance of approximately 4,600 feet. A second arrow on the map measures

the distance between a "prominent vista" along the Otay Truck Trail used by the Border

Patrol for surveying the area and known as the "56 Scope Site" (labeled in green on the

map) and the nearest concurrence of Plaintiffs' private property and the Critical Habitat;

a distance of approximately 4,200 feet. The approximate path of the Otay Truck Trail is

marked by a dotted purple line found in the north-eastern corner of the map.

4. I have read the Declaration of David Hogan dated May 12, 2008, in which he

states:

> I have traveled to Critical Habitat Unit 5D in the past and I intend to return
> to that critical habitat unit as part of my regular visits to the Otay
> Mountain Wilderness via Otay Mountain road, a.k.a. Otay Mountain truck
> trail. Portions of Critical Habitat Unit 5D are accessible via roads open to
> the public, and I often stop at a prominent vista overlooking Critical
> Habitat Unit 5D on my trips to and from the Otay Mountain Wilderness.
> My visits to the Otay Mountain Wilderness via Critical Habitat Unit 5D
> occur, approximately, on an annual basis.

5. Mr. Hogan could not have accessed the subject property via the Otay truck

trail or any public road, as no public road provides access to it. This area can only be

reached by heavy duty utility vehicle or horseback as there is no public road leading to it.

Plaintiffs have never given Mr. Hogan nor any other representative of the Center for

Biological Diversity ("CBD") permission to enter their land and, to the best of my

knowledge, neither Mr. Hogan nor any CBD representative has ever done so. The only

way Mr. Hogan could access the Otay truck trail is to trespass on land owned by

Plaintiffs and managed by me.

3

6. The Otay truck trail to which Mr. Hogan refers is located approximately 1 mile from the designated area on the subject property, and not even Superman could observe fairy shrimp (if they existed on the subject property) from that distance. Moreover, the Otay truck trail is not a publicly maintained or publicly dedicated road; and is accessed via a locked gate located on private land owned by International Industrial Park, Inc., which I also manage. International Industrial Park ("IIP") has not given Mr. Hogan permission to enter its land, nor does he have a key to the locked gate. The only way Mr. Hogan could access the Otay truck trail is to trespass on land owned by IIP and managed by me.

7. In 2007, I retained an expert in fairy shrimp habitat to conduct a habitat survey of the subject property. That survey found no fairy shrimp, no vernal pools and no habitat on the subject property. Accordingly, even if he had access to the subject property, there would be nothing for Mr. Hogan to observe.

8. In reliance on this survey, on April 19, 2007, I filed with the Fish and Wildlife Service ("FWS") a comment on the proposed rule in which I pointed out that Plaintiffs land did not exhibit the characteristics of fairy shrimp habitat, and that FWS' mapping of critical habitat to include Plaintiffs' land was therefore "flawed and/or inaccurate." When the final rule was published in December 2007, designating approximately 143 acres of Plaintiffs' land as critical habitat for the fairy shrimp without explaining why, I instructed my lawyers to get to the bottom of this designation by opening discussions with FWS officials. I subsequently authorized my lawyers, at the suggestion of FWS officials, to submit a Freedom of Information Act request for all such evidence indicating the presence of fairy shrimp habitat on the subject property. (Ex. 2.) Although FWS

4

provided a CD of data, none of it demonstrated that there was habitat on the subject property. Convinced that FWS would not voluntarily review the evidence, I authorized the filing of this suit to require FWS to identify any evidence in the record supporting designation of Plaintiffs' property as fairy shrimp habitat.

I declare the foregoing to be true and correct under penalty of perjury as provided in 28 U.S.C. § 1746.

Execute this 7th day of June, 2008

David Wick

5

Exhibit 1

Civ. No. 1:08-cv-00383-(RMC)



Approximate Location "56 Scope Site"

Approximate Location OTAY TRUCK TRAIL

Appr 4,200 Feet

Appr 4,600 Feet

N

*Rancho Vista Del Mar*

*OTAY INTER-NATIONAL LLC*

*OTAY MESA PROPERTY LP*

Property outlined in Red
FAIRY SHRIMP OVERLAY

OTAY MESA RD

ENERGY   CENTER WAY

ACCESS RD.

LOOP RD

ACCESS RD

INTERNATIONAL

INTERNATIONAL     BOUNDARY

MEXICO