# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OTAY MESA PROPERTY L.P., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 08-383 (RMC) |
| ) | |
| U.S. DEPARTMENT OF THE INTERIOR, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

The owners of 143 acres of property on Otay Mesa in San Diego County, California, sue the U.S. Fish and Wildlife Service ("FWS") to cancel its designation of this portion of their property as critical habitat for the endangered San Diego fairy shrimp under the Endangered Species Act, 16 U.S.C. § 1531 *et seq*. The Court now considers the parties' cross-motions for summary judgment.

The government's evidence that the San Diego fairy shrimp actually "occupied" the property at the time it was designated is distinctly thin. Plaintiffs argue that without such proof, no habitat can be designated as "critical." Having failed to designate critical habitat when it listed the San Diego fairy shrimp as endangered, FWS did so years later after being reminded of its obligation by a lawsuit. The passage of time necessarily forced FWS to assume that what it discovered later had existed earlier. Because the San Diego fairy shrimp live in vernal pools on land and move rarely, it cannot be said that this assumption was irrational. In addition, while the Court may not have reached the same conclusions as the agency on how to perform the economic analysis of critical

habitat designation, that is not what is required. Reviewing the final rule at issue, the Court concludes that FWS is entitled to *Chevron*[1] deference. Summary judgment will be entered for the Defendants.

## I. STATUTORY BACKGROUND

Much could be written about the Endangered Species Act ("ESA"), but a short synopsis of the relevant provisions should suffice. The purpose of the ESA is to conserve and protect endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). A species is endangered if it is "in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). Ken Salazar, the Secretary of the Interior (sued here in his official capacity only), is responsible for non-marine species and administers the ESA through FWS, which has delegated authority to list animal species as either endangered or threatened. *Id.* § 1533(a). This determination is to be made on the basis of the best available scientific and commercial data. *Id.* § 1533(b).

FWS also must designate critical habitat for any endangered or threatened species by final regulation published concurrently with the final rule listing the relevant species as threatened or endangered, "to the maximum extent prudent and determinable." *Id.* § 1533(a)(3)(A). The Secretary "may, from time-to-time thereafter as appropriate, revise such designation." *Id.* § 1533(a)(3)(A)(ii). Critical habitat is defined in the ESA as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed [as endangered or threatened under the statute], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

_____

[1] *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

> (ii) specific areas outside the geographical area occupied by the species at the time it is listed . . . , upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id.* § 1532(5)(A). The "physical or biological features essential to the conservation of the species" are known as "primary constituent elements." Designation of Critical Habitat for the San Diego Fairy Shrimp ("2007 Final Rule"), 72 Fed. Reg. 70,648, 70,663 (Dec. 12, 2007) .

The FWS must designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). Any area may be excluded if FWS "determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." *Id.*

## II. FACTS

Pursuant to this statutory scheme, FWS published a final rule on February 3, 1997, listing the San Diego fairy shrimp (*Branchinecta sandiegonensis*) as an endangered species. Determination of Endangered Status for the San Diego Fairy Shrimp, 62 Fed. Reg. 4,925 (Feb. 3, 1997). The San Diego fairy shrimp is a small aquatic crustacean that lives in vernal pools (shallow depressions that hold water seasonally) and other ephemeral basins. *See* 72 Fed. Reg. 70,648. Vernal pools tend to occur in clusters called "complexes" that are hydrologically connected. *Id.* at 70,648. For this reason, FWS believes that vernal pool ecosystems are "best described from a watershed perspective," which includes "all areas around a vernal pool complex needed to collect rainfall and adequately fill the vernal pool basins within the vernal pool complex." *Id.* San Diego fairy shrimp feed on algae, diatoms, and particulate organic matter. *Id.*

San Diego fairy shrimp were first distinguished taxonomically in 1993, listed as

endangered in 1997, and included in a recovery plan for seven vernal pool species in Southern California in 1998. *Id.* at 70,657. In other words, scientists barely had recognized the existence of San Diego fairy shrimp before FWS declared them to be in danger of extinction.

These little crustaceans are found only in vernal pools in southwestern coastal California and northwestern Baja California, Mexico. *Id.* The pools fill with water during fall and winter rains and evaporate in the spring. *Id.* "Adult San Diego fairy shrimp are usually observed from January to March." *Id.* at 70,664. Depending on the timing of the annual rainfall, the time when adult fairy shrimp are present may be earlier or later in any given year. *Id.* The San Diego fairy shrimp hatches and matures within seven (7) to ten (10) days from the time the pools fill with water. *Id.*

The San Diego fairy shrimp disappear after about a month, but shrimp will continue to hatch if subsequent rains result in additional water. Only a small portion of the eggs hatch each time the vernal pools fill with water; other eggs stay dormant in the soil. *Id.* The San Diego fairy shrimp are able to persist in vernal pools over the course of several seasons, even if conditions are not ideal for successful reproduction. *Id.* The pools range in depth from two (2) to twelve (12) inches. *Id.* at 70,665. San Diego fairy shrimp are distinguishable from other vernal pool crustaceans. *Id.* at 70,648.

In 1998, the Center for Biological Diversity (an intervenor in this matter) sued to compel FWS to designate critical habitat for the San Diego fairy shrimp after the agency failed to do so when it listed the shrimp as endangered. *Southwest Ctr. for Biological Diversity v. Berg*, Civ. No. 98-1866 (S.D. Cal. filed Oct. 14, 1998). Then, when FWS issued its final critical habitat designation in October 2000, it was sued by several industry groups. *See Building Indus. Ass'n v.*

*Norton*, Civ. No. 01-7028 (C.D. Cal. filed Aug. 13, 2001). In response, FWS sought a voluntary remand of its rulemaking record for further consideration. The District Court in the Central District of California, Western Division, Judge Stephen D. Wilson, granted the motion:

> The Service's motion for voluntary remand of the gnatcatcher and fairy shrimp critical habitat designations is GRANTED in light of the analysis of economic impact under 16 U.S.C. § 1533(b)(2) set forth by the Tenth Circuit in *New Mexico Cattle Growers*.[2] The Court agrees that *New Mexico Cattle Growers* is correctly decided, and the Service must reconsider the economic impact of these two critical habitats in accordance with the Tenth Circuit's teachings.

*Natural Resources Defense Counsel v. United States Dep't of the Interior*, 275 F. Supp. 2d 1136, 1156 (C.D. Cal. 2002). FWS proposed that it would follow the dictates of *New Mexico Cattle Growers* and analyze all of the costs of designating critical habitat even if some of those costs were also caused by the designation of the fairy shrimp as endangered. *Id.* at 1141-42. That, however, is not what happened. Instead, FWS returned to its initial policy, by which it discounts all economic impacts of listing a species as endangered because such impacts are below the "baseline" from which FWS then distinguishes and calculates the economic impacts of only critical habitat designation as above the "baseline." *See* A.R. (Addendum to San Diego Fairy Shrimp Draft Economic Analysis at 4) at 018300 ("The current practice of [FWS] in its economic analysis of proposed critical habitat regulations is to estimate the impacts occurring as a result of baseline regulations and then estimate the impacts that are incremental to that baseline . . .").

FWS proposed revised critical habitat on April 22, 2003, Designation of Critical Habitat for the San Diego Fairy Shrimp ("2003 Proposed Rule"), 68 Fed. Reg. 19,888, and published

---

[2] *New Mexico Cattle Growers Ass'n v. United States Fish & Wildlife Serv.*, 248 F.3d 1277, 1280 (10th Cir. 2001).

the current final revised critical habitat designation on December 12, 2007. 2007 Final Rule, 72 Fed. Reg. 70,648. Plaintiffs here are all partnerships or corporations that own parcels of unimproved land in the Otay Mesa area of San Diego County, California. The land owned by Plaintiff Otay Mesa Property, L.P., includes 74.55 acres of land that have been designated as critical habitat for the San Diego fairy shrimp. Compl. ¶ 1. One hundred-twenty (120) acres of land owned by Plaintiff Rancho Vista Del Mar and eighty (80) acres of land owned by Plaintiff Otay International, LLC, also have been so designated. Compl. ¶ 2 & 3.

Plaintiffs filed this Complaint on March 3, 2008. The parties then filed cross-motions for summary judgment. The Court denied those motions without prejudice and ordered additional briefing on August 13, 2009. After reviewing the parties' supplemental briefs, the Court considers their renewed motions for summary judgment here.[3]

### III. LEGAL STANDARD

Plaintiffs bring their challenge to the critical habitat designation pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001). In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted). At a minimum, the agency must have

_____

[3] The Center for Biological Diversity was granted leave to intervene as a defendant on November 3, 2008, and also filed a motion for summary judgment. *See* Dkt. # 31 (original motion); Dkt. # 62 (renewed motion).

considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). An agency action usually is arbitrary or capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also County of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.").

As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. In cases involving scientific or technical decisions within the agency's area of expertise, the agency is entitled to a "high level of deference." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998). When confronted with subject matter characterized by scientific and technological uncertainty, courts "must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives." *Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 177 (D.D.C. 2000); *Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find

contrary views more persuasive."). Judges are not "scientists independently capable of assessing the validity of the agency's determination;" instead of making an independent assessment, courts must hold the agency to the "standards of rationality required by the [APA]." *Serono Labs.*, 158 F.3d at 1327; *see Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) ("We must look at the [agency] decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.").

When a plaintiff challenges an agency's interpretation of a statute, the court must undertake a two-step analysis as set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). First, a court must determine whether "Congress has directly spoken to the precise question at issue" and if so the court must "give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. To decide whether Congress has addressed the precise question at issue, a court must analyze the text, purpose, and structure of the statute. *Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 124 (D.C. Cir. 2006).

If the statute is silent or ambiguous on the question, the court must proceed to the second step of the *Chevron* analysis and determine whether the agency's interpretation is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 843. When an agency's interpretation of a statute is challenged at step two, its "interpretation need not be the best or most natural one by grammatical or other standards . . . . Rather [it] need be only reasonable to warrant deference." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991). "The court need not conclude that the agency's construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen

in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. If the agency's statutory construction is

permissible, then the court must defer to the agency's interpretation. *Id.*

## IV. ANALYSIS

### A. Standing

Defendants challenge Plaintiffs' standing to bring this suit, pointing out that the Court

must assure itself of its jurisdiction before hearing the merits. *Steel Co. v. Citizens for a Better*

*Env't*, 523 U.S. 83, 94 (1998). To meet their burden on a motion for summary judgment, Plaintiffs

must allege facts that show: (1) they have "suffered an 'injury-in-fact'" to a legally protected interest

that is both "concrete and particularized" and "actual or imminent," as opposed to "conjectural" or

"hypothetical"; (2) there is a "causal connection between the injury and the conduct complained of";

and (3) it is "likely" – not merely "speculative" – "that the injury will be 'redressed by a favorable

decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted).

Defendants argue that Plaintiffs' asserted "inability to develop and market [their]

highly valuable land" has not been demonstrated by affidavits or otherwise and thus they have failed

to meet their burden. Further, they contend, Plaintiffs have failed to demonstrate that the alleged

inability to develop and market their land is a result of the critical habitat designation or that a

decision in their favor here would redress the alleged injury. Finally, Defendants argue that Plaintiffs

have no standing to complain of the critical habitat designation on land they do not own.[4]

Plaintiffs disagree. They rely on two declarations of David Wick, the manager of the

property since 1992. Mr. Wick has nearly 30 years of experience in land development in San Diego

---

[4] Plaintiffs do not respond to this argument and the Complaint does not clearly complain of the critical habitat designation of land other than their own 143 acres. The Court takes the matter as conceded.

County and testifies that, "[i]n my experience, such environmental constraints significantly add to the time and expense of development and can, in extreme cases, make certain projects economically infeasible." Pls.' Opp'n to Mots. For Summ. J. [Dkt. # 63], 2nd Decl. Of David Wick ¶ 2. He adds,

> In 2008, the Government issued a Presidential Permit for a third border crossing. The financial impact of this new Mexico/U.S. border crossing on the subject property will be enormous because the new border crossing will substantially increase the demand for industrial and commercial space in the immediate area. The port of entry is a magnet for industrial and commercial development, and the subject property is directly in the path of this anticipated development. The new port of entry is expected to be completed by 2014-15. When the third port of entry is built, the highest and best use of the subject property will change from an industrial use to a commercial retail use, making the land even more valuable.

*Id.* ¶ 7. To these statements concerning the land and the impact of the critical habitat designation, Plaintiffs add a quote from *Lujan v. Defenders of Wildlife*:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

504 U.S. at 561-62. In reply, Defendants point to *Summers v. Earth Island Inst.*, 129 S. Ct. 1142 (2009), for the proposition that non-specific allegations of harm are insufficient to support standing. Fed. Defs.' Reply [Dkt. # 65] at 3.

Defendants over-read *Summers v. Earth Island Institute*. In that case, the Supreme Court held that the plaintiff environmental organizations did not *retain* standing after they had settled the only part of the case on which their standing originally rested. Thus, the imprecise future

intentions of unspecified members of the Sierra Club to visit national forests was insufficient to give standing to the organization (and others) to challenge regulations issued by the Forest Service dealing with Sequoia National Forest. Rather, to demonstrate standing, a plaintiff must allege "such a personal stake" in the issue at hand "as to warrant *his* invocation of federal-court jurisdiction." 129 S. Ct. at 1149 (*quoting Warth v. Seldin*, 422 U.S. 490, 498-499 (1975)). Plaintiffs' Complaint achieves this standard and satisfies *Lujan*.

In addition, Defendants assert that merely designating Plaintiffs' real property as "critical habitat" imposes no burden on Plaintiffs and that Plaintiffs describe only *potential future* development of the land, with the exception of various easements that are not affected by the designation. In their eagerness, Defendants provide a very parsimonious reading of the statute.

First, the ESA specifies that "it is unlawful for any person . . . to . . . take any such species [listed as endangered or threatened under 18 U.S.C. § 1533] within the United States." 16 U.S.C. § 1538. FWS has defined "take" to mean any "harm" to a listed species. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 690-691 (1995); *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184-85 (1978) ("All persons, including federal agencies, are specifically instructed not to 'take' endangered species, meaning that no one is 'to harass, harm,[5] pursue, hunt, shoot, wound, kill, trap, capture or collect' such life forms."). Thus, any development on Plaintiffs'

_____

[5]        . . . The Secretary of the Interior has defined the term "harm" to mean "an act or omission which actually injures or kills wildlife, including acts which annoy it to such an extent as to significantly disrupt essential behavioral patterns, which include, but are not limited to, breeding, feeding or sheltering; *significant environmental modification or degradation which has such effects is included within the meaning of 'harm.'*"

*Tennessee Valley Auth.*, 437 U.S. at 184 n. 30 (emphasis in original) (citation omitted).

-11-

designated 143 acres that would affect its critical habitat so as to put the San Diego fairy shrimp in further jeopardy of extinction might "harm" that species and violate the ESA. This result is not speculative or uncertain: once FWS designated the real property on Otay Mesa as critical habitat, the ESA instantly precluded Plaintiffs from taking any action that would harm the San Diego fairy shrimp. Since this limitation on Plaintiffs' abilities to develop their property is real and now, it constitutes an injury-in-fact caused by FWS's action.

A successful challenge that required the Secretary to withdraw his inclusion of Plaintiffs' 143 acres in the critical habitat designation for San Diego fairy shrimp certainly would redress Plaintiffs' alleged wrong.[6] Therefore, Plaintiffs have standing to bring this lawsuit.

### B. Designation of Plaintiffs' Land as Critical Habitat

The question remains whether FWS has properly designated Plaintiffs' 143 acres on Otay Mesa as part of the San Diego fairy shrimp's critical habitat, which, by rule, covers 3,082 acres. For the reasons that follow, the Court concludes that it has done so.

### 1. San Diego Fairy Shrimp Occupy Plaintiffs' Land

Under the ESA, critical habitat for an endangered or threatened species is to include

---

[6] In this regard, the Court notes that FWS did not designate Plaintiffs' land as critical habitat in its 2000 Final Rule, Final Determination of Critical Habitat for the San Diego Fairy Shrimp, 65 Fed. Reg. 63,438 (Oct. 23, 2000), rejected by Judge Wilson. In a proposed rule published in 2003, FWS "considered, but did not propose" as critical habitat, certain areas of land, including land belonging to Plaintiffs. *See* 2003 Proposed Rule, 68 Fed. Reg. 19,888. This land was not included at that time because FWS either believed the land was not essential to the conservation of the San Diego fairy shrimp or it excluded the lands pursuant to the ESA. After re-analyzing these lands, however, FWS has concluded that they are critical habitat and should not be excluded. *See* 2007 Final Rule, 72 Fed. Reg. at 70,658-59 ("This final revision to critical habitat includes some lands that were not identified in the [1998] recovery plan or the 2000 critical habitat designation, but which we have since concluded are within the geographical area occupied by the species at the time of listing and contain the physical and biological features essential to the conservation of the species."); *Id.* at 70,662 (Table 1).

"the specific areas within the geographical area occupied by the species, at the time it is listed . . .

on which are found those physical or biological features (I) essential to the conservation of the

species and (II) which may require special management considerations or protection," and

unoccupied geographical areas if such areas are "essential for the conservation of the species."

16 U.S.C. § 1532(5)(A). FWS concluded that "[a]ll areas designated as critical habitat for the San

Diego fairy shrimp are occupied." 72 Fed. Reg. at 70,664. Plaintiffs argue strenuously that there

is no proof that the San Diego fairy shrimp occupied their real property when the crustacean was

listed as endangered in 1997. With a little less force, they also argue that the San Diego fairy shrimp

is not there now.

Plaintiffs focus on the fact that four San Diego fairy shrimp were observed on their

property in a "tire rut" in 2001 but that the tire rut has long since disappeared as a result of road

grading by the Border Patrol. Pls.' Mot. For Summ. J. [Dkt. # 60] at 2-3 (citing A.R. at 2322 (Sept.

19, 2001 EDAW Letter)). They dispute whether fairy shrimp larvae, observed at a cattle pond on

their property, were actually San Diego fairy shrimp (as assumed by the contractor for FWS who was

surveying for fairy shrimp) or were, instead, some other, more common, species of fairy shrimp. *See*

Pls.' Combined Opp'n and Reply [Dkt. # 63] at 21-22.

These two sightings — one disputed — and the nature of the property itself form the

basis for the announcement by the FWS that it "considered" the entire area "occupied" by San Diego

fairy shrimp, both in 1997 and currently. Plaintiffs assail this conclusion as based on faux science.

FWS is directed by Congress to make its determinations on critical habitat "on the

basis of the best scientific data available." 16 U.S.C. § 1533(b)(2). FWS does not have the duty to

engage in field work itself. Here, surveys by outside contractors advised that San Diego fairy shrimp

had been observed at location # 5 (the road rut) and location # 68 (the cattle pond).  In other words, not only is the property appropriate for San Diego fairy shrimp but they have been observed on it.  The lack of sightings in the most immediate past may not be determinative.  San Diego fairy shrimp cysts, or eggs, drop to the bottom of the vernal pools and into the mud where they can remain viable for years until the right combination of water, temperature, and other factors trigger their development. 72 Fed. Reg. at 70,664.

What FWS knew when they issued the subject Final Rule on critical habitat was that a portion of Plaintiffs' property presented the right terrain and other suitable conditions for San Diego fairy shrimp and that they had, in fact, been observed there.  Plaintiffs protest, however, that FWS did not know that the San Diego fairy shrimp was on their land at the time it designated the creature as an endangered species and that, missing this statutory requirement, FWS cannot now label their land as critical habitat.  There is some basis for this argument in the language of the ESA, which defines critical habitat as "the specific areas within the geographical area *occupied by the species, at the time it is listed*" as endangered or threatened under the statute. 16 U.S.C. § 1532(5) (emphasis added).  However, the Secretary "may, from time-to-time thereafter as appropriate, revise such designation." *Id.* § 1533(a)(3)(A)(ii).

The question, therefore, is not whether FWS knew in 1997, when it listed the San Diego fairy shrimp as endangered, that there were San Diego fairy shrimp on Plaintiffs' property but, rather, whether FWS reasonably concluded, based on data from 2001, that the shrimp had been on the property in 1997.  *See Ethyl Corp.*, 541 F.2d at 36-38 (noting that the court's duty is not to determine if the agency's decision is scientifically perfect, but whether it is rationally based on the scientific evidence available).  This construction makes sense of both the timing requirement and

the Secretary's authority to revise a critical habitat designation. *See Chevron*, 467 U.S. at 843 (finding that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute").

The Court concludes that FWS was reasonable in its consideration that San Diego fairy tail shrimp found in a hospitable location in 2001 would have also occupied the same location in 1997. An agency must provide a "satisfactory explanation" for its decision, including a "rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, and FWS has done so. Vernal pool complexes present on Plaintiffs' land in 2001 were also present in 1997. Soil types present in 2001 were also present in 1997. Hydrologic conditions present in 2001 were also present in 1997. Additionally, the San Diego fairy shrimp is not much of a wanderer. The 2007 Final Rule notes that "new" populations likely have been identified in various areas in the years following 1997 "not because the San Diego fairy shrimp recently appeared there," but because there is a relatively small number of scientists trained to survey for this species and the later surveys were the first surveys conducted at those locations. 72 Fed. Reg. at 70,666.

### 2. Plaintiffs' Land Contains Primary Constituent Elements Necessary to the Recovery or Survival of San Diego Fairy Shrimp

Plaintiffs also challenge FWS's determination that their land contained the "physical or biological features" necessary to the conservation of the fairy shrimp. *See* 16 U.S.C. § 1532(5)(A)(i). FWS refers to these features as "primary constituent elements." Fed. Defs.' Cross-Mot. For Summ. J. [Dkt. # 57] at 17. FWS identified three primary constituent elements that must be present for real property to be designated as critical habitat for the San Diego fairy shrimp: (1) certain types of vernal pool complexes; (2) appropriate connecting hydrology; and (3) appropriate

soils and topography.  *Id.* at 17 (citing 72 Fed. Reg. at 70,665).  The Final Rule designating critical habitat for the San Diego fairy shrimp states that all of these elements are present on all land designated as critical habitat.  72 Fed. Reg. at 70,665.  Plaintiffs argue that there is no evidence in the record to support the conclusion that their land contains these elements.

Plaintiffs' land is contained in subunit 5D of the land designated as critical habitat for the San Diego fairy shrimp.  Pls.' Mot. For Summ. J. at 9-10.  Plaintiffs argue that although parts of subunit 5D clearly contain vernal pools and other primary constituent elements, there is no evidence that these elements actually are present on the 143 acres they own.  FWS argues that it need only make its determination "at the subunit level, not with respect to individual parcels within each subunit."  Fed. Defs.' Opp'n at 18.  In the critical habitat designation, FWS notes that it stopped using a 328 feet (or 100 meters) grid to map critical habitat because such a grid was imprecise, and that for the final designation it used "location data" to map vernal pools, "topographical maps, soil maps, and arial imagery to capture the [primary constituent elements] associated with each vernal pool complex."  72 Fed. Reg. at 70,653.  The Court finds that using the data described above to determine critical habitat at the subunit level comports with the statute's command that FWS designate "specific areas" occupied by the San Deigo fairy shrimp and containing the "physical or biological features" essential to its conservation.  *See* 16 U.S.C. § 1532(5)(A)(I); *Chevron*, 467 U.S. at 843 (where Congress has not addressed a specific question raised by a statute, the court only need determine whether the agency's construction of that statute is a permissible one).

The critical habitat designation states:  "[W]e reanalyzed subunit 5D. We removed all areas in this subunit that do not contain features essential to the conservation of the San Diego fairy shrimp. However, a large portion of subunit 5D has been designated because it contains features

-16-

in quantity and spatial arrangement essential to the conservation of the San Diego fairy shrimp, *i.e.*, [primary constituent elements]." 72 Fed. Reg. at 70655. Additionally, in examining land known to contain vernal pool complexes, the "boundaries were drawn to group and classify vernal pool complexes and did not always capture the entire watershed area needed to support the vernal pool complex. To better capture the watershed areas in the critical habitat we included areas of similar topography and soil type." 72 Fed. Reg. at 70,666. Thus, even if some of Plaintiffs' 143 acres do not contain vernal pools at the current time, FWS concluded that the land was necessary to support the existing vernal pools in subunit 5D because "[t]he area designated as critical habitat gently slopes to the south and contains several vernal pools" and the land is "relatively undamaged by development and off-road vehicle activity." *Id.* at 70,653.

> We are designating subunit 5D as critical habitat for the San Diego fairy shrimp. Subunit 5D consists of 391 ac (158 ha) or habitat occupied by the species at the time of listing and the species continues to occur within this subunit. This subunit contains all of the features essential to the conservation of the species. Subunit 5D is located north of the United States/Mexico border, at the base of Otay Mountain, 13 mi (21 km) inland from the coast. Subunit 5D consists entirely of privately owned land. The vernal pool complexes in this unit have not yet been directly impacted by development or fragmentation. The populations of San Diego fairy shrimp in this subunit are the closest United States population to any of the populations of San Diego fairy shrimp in Mexico. As vernal pool complexes become more fragmented by development in both the United States and Mexico, the preservation of vernal pool complexes near to one another will be increasingly important to these ecosystems to provide continuity in the range between the United States and Mexico. The PCEs in this subunit may require special management considerations or protection to address on-going threats from development, off-road vehicle use, and nonnative weed invasion that may negatively impact the San Diego fairy shrimp and its habitat.

72 Fed. Reg. at 70,674. FWS has explained its analysis and its reasoning for including subunit 5D in the critical habitat designation for San Diego fairy shrimp. The Court cannot say that its actions have been arbitrary, capricious, or contrary to law. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also County of Los Angeles*, 192 F.3d at 1021.

### 4. FWS Performed the Correct Economic Analysis

As a threshold matter, FWS argues that Plaintiffs "enumerate[d] three specific reasons why they alleged that [FWS's] inclusion of their property in the critical habitat designation for the San Diego fairy shrimp is arbitrary and capricious, or otherwise contrary to law," and none of these reasons deals with the economic impact of the designation. Fed. Defs.' Supplemental Brief [Dkt. # 51] at 5. FWS therefore argues that Plaintiffs have not stated a claim regarding the economic impact analysis and the Court need not reach the issue of which methodology is appropriate. Plaintiffs counter that their Complaint complies with the Federal Rules of Civil Procedure and need not contain legal arguments, and that they are permitted to adopt new legal theories as their case progresses. Pls.' Supplemental Reply Brief [Dkt. # 55] at 2.

The Court agrees with Plaintiffs on this point. The Complaint states that after FWS published a proposed rule designating 143 acres of Plaintiffs' land as part of the critical habitat for the San Diego fairy shrimp, "Plaintiffs submitted written comments . . . pointing out that Plaintiffs' land did not contain the physical and biological features necessary to the conservation for the San Diego fairy shrimp, and that it therefore did not meet the statutory definition for designation as critical habitat." Compl. ¶ 19. "Nevertheless, without explanation, on December 12, 2007, Defendants published a final rule designating Plaintiffs' land as critical habitat for the San Diego fairy shrimp." *Id.* ¶ 20. The Complaint provides several reasons why Plaintiffs believe the

designation of their land was improper.  *See id.* ¶ 22.  Rule 8 does not require a plaintiff to set forth

in his complaint all of the legal theories on which he may rely.  *See Krieger v. Fadely*, 211 F.3d 134,

136 (D.C. Cir. 2000) (noting that "complaints need not plead law or match facts to every element

of a legal theory") (quotation marks omitted); *Hanson v. Hoffman*, 628 F.2d 42, 53 (D.C. Cir. 1980).

Any theory advanced, however, must be supported by the facts in the complaint and a defendant

must have notice and the opportunity to respond.  *See Arent v. Shalala*, 70 F.3d 610, 618-619 (D.C.

Cir. 1995) (finding that "lack of specificity is not fatal" to a complaint where defendants had "fair

notice" of the plaintiff's claims); *Hanson*, 628 F.2d at 52-53, 53  n.11.  FWS has had such an

opportunity here, so the Court may properly consider whether FWS conducted an appropriate

economic analysis as part of its critical habitat designation for the San Diego fairy shrimp.

       The ESA is very clear:  economic impact is *not* to be taken into consideration when

determining whether to list a species as threatened or endangered but *is* to be taken into consideration

when determining critical habitat designations.  *See* 16 U.S.C. § 1533(b); *New Mexico Cattle*

*Growers*, 248 F.3d at 1280; *Cape Hatteras Access Pres. Alliance v. United States DOI*, 344 F. Supp.

2d 108, 130 (D.D.C. 2004).   There are two approaches to this analysis when designating critical

habitat: (1) calculate all of the costs associated with both listing the species as endangered and

designating its critical habitat (coextensive approach) or (2) put any economic effects from listing

the species below a baseline and calculate those costs attributable only to habitat designation

(baseline approach).  The one preferred by the FWS is the baseline approach.

           The baseline approach utilized by the FWS is premised on the idea
           that the listing of the species (which will occur prior to or
           simultaneously with the [critical habitat designation]) will have
           economic impacts that are not to be considered.  The primary
           statutory rationale for this position comes from 16 U.S.C.

-19-

§ 1533(b)(1)(A), which states that listing determinations be made "solely on the basis of the best scientific and commercial data available." Thus, the approach moves any economic impact that can be attributed to listing below the baseline and, when making the [critical habitation designation], takes into account only those economic impacts rising above the baseline.

*New Mexico Cattle Growers*, 248 F.3d at 1280. In *New Mexico Cattle Growers*, the Tenth Circuit "expressly rejected" the baseline approach. *Id.* at 1285. *But see Cape Hatteras*, 344 F. Supp. 2d at 130 (D.D.C. 2004). Judge Wilson ordered FWS to follow *New Mexico Cattle Growers*.

Plaintiffs argue that FWS was required, by all or one of the doctrines of "law of the case," *res judicata*, and collateral estoppel, to use a coextensive approach to determining the economic impact of critical habitat designation here because of the remand. That was certainly what Judge Wilson expected and expressly ordered. This Court need not address whether any of the cited doctrines is applicable, however, because it finds that FWS legitimately reconsidered its position and has ably defended it in the Administrative Record and in this Court.

FWS is directed by Congress to make its listing determination and critical habitat determination at approximately the same time. 16 U.S.C. § 1533(a)(3)(A)(i) ("[The Secretary] shall, concurrently with making a determination . . . that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat"). In practice, however, FWS consistently fails to meet this command and most often must be sued to even begin to think about critical habitat. This is because FWS holds the longstanding belief that almost all of the protections for a species result from listing it as threatened or endangered and that designating critical habitat adds very little else. *See New Mexico Cattle Growers*, 248 F. 3d at 1283-84; *Cape Hatteras*, 344 F. Supp. 2d at 127; *see also* Fed. Defs.' Mem. In Opp'n and Cross-Mot. For

Summ. J. [Dkt. # 57] at 4 ("The listing of a species affords protection under the ESA, regardless of whether critical habitat is designated."). But by extending the time between listing and habitat designation, FWS has created a false dichotomy between the economic impacts of listing alone and the economic impacts of habitat designation alone. If, as the statute directs, the decisions on listing and habitat were made at approximately the same time, the ban on considering economic impacts when listing and the requirement to consider economic impacts when designating habitat would be more comprehensible and complete.

Congress does not want economic impacts to affect any scientific decision that a species is threatened or endangered. The country's commitment to good science in this regard is clear. However, when it comes to designating critical habitat, Congress ordered the Secretary to assess a broader scope of elements, including the economic impact on the animals who share the planet with the endangered species, *i.e.*, humans. Were these two decisions made contemporaneously, the full economic impacts from critical habitat designation would sensibly be made to cover all such impacts. Just because an economic impact would be caused by listing does not make that impact any less caused by habitat designation. But it is to be considered only in habitat designation because it is at that point that use of the same space by endangered species and by other creatures must be considered and balanced.

Judge Wilson ordered FWS to "reconsider the economic impact of these two critical habitats in accordance with the Tenth Circuit's teachings." *Natural Resources Defense Counsel*, 275 F. Supp. 2d at 1156. Accordingly, in 2004, FWS announced a draft economic analysis utilizing the co-extensive approach. Fed. Defs.' Supp. Brief at 5; *See* Notice of the Availability of Draft Economic Analyses, 69 Fed. Reg. 18,516 (Apr. 8, 2004). However, following perceived changes

in the state of the law, FWS ordered an addendum to the draft economic analysis, utilizing only the baseline approach. Fed. Defs.' Supp. Brief at 5; A.R. at 018297 (Addendum to San Diego Fairy Shrimp Draft Economic Analysis at 1). FWS argues that the Addendum did not replace the 2004 analysis, but merely updated it. Fed. Defs.' Supp. Brief at 5. The argument fails to appreciate that the Final Rule is based on the Addendum, not the 2004 analysis; it is the Addendum that must rise or fall as an appropriate exercise of agency discretion.

The Addendum, completed in 2007, states: "The current practice of [FWS] in its economic analysis of proposed critical habitat regulations is to estimate the impacts occurring as a result of baseline regulations and then estimate the impacts that are incremental to that baseline (i.e., impacts caused solely by the designation of critical habitat)." A.R. at 018300 (Addendum at 4). It further states that, pursuant to "new guidance from [FWS]," the analysis included therein does not consider the impacts that could result from the listing of the species. *Id.* However, the Final Rule designating critical habitat states:

> The [2004 Draft Economic Analysis] estimated $53,042,532 in economic costs associated with the conservation of the San Deigo fairy shrimp over the next 20 years . . . . At the time the [draft economic analysis] was conducted, we looked at the total cost of listing and critical habitat without attributing which costs were related specifically to the designation of critical habitat (incremental impacts). The addendum estimates that 44 percent or $ 23,140,688 of the cost is attributable to the critical habitat designation . . . .

72 Fed. Reg. at 70688. The Final Rule also states that FWS evaluated the Draft Economic Analysis and Addendum to conclude that the critical habitat designation would not have an annual effect on the economy of $100 million or more. *Id.* at 70689. Finally, FWS states that the "economic analysis of subunit 5D did not indicate that the economic impacts in this subunit were substantially different

from other areas included in critical habitat, therefore we have not excluded this area due to disproportionate economic impacts." *Id.* at 70,655.

Plaintiffs argue that FWS did not follow Judge Wilson's order requiring it to prepare a proper economic analysis that considered co-extensive economic impacts instead of merely those above the baseline. Pls.' Mot. For Summ. J. at 29-30. Since it is clear that FWS conducted a co-extensive analysis in the 2004 Draft Economic Analysis but relied upon the baseline method of calculation in the Addendum and 2007 Final Rule, the question is really whether that reliance invalidates the final rule. The Court concludes that it does not. While the Court would not adopt the baseline method, Congress entrusted those decisions to the discretion of the Secretary, not this Court. *Chevron*, 467 U.S. at 843 n.11 (noting that the agency's construction of the statute need not be the construction preferred by the court).[7] There being no specific command from Congress, the FWS must exercise its expertise and adopt its own approach. *Id.* at 843-844. The confusing and conflicting court decisions in this area demonstrate that reasonable minds can reasonably differ. Thus, despite the district court order by Judge Wilson, as long as the FWS fully explained itself and acted within the scope of its discretion, it was free to change its mind and return to apply and defend, here, the baseline approach.

FWS has explained its preference for the baseline method and fully explained the analyses that underlie the critical habitat designation for the San Diego fairy shrimp. It need do no more. *Id.* at 845 (quoting *United States v. Shimer*, 367 U.S. 374, 382-383 (1961)) ("If [the agency's] choice represents a reasonable accommodation of conflicting policies that were committed to the

---

[7] Because the statute does not unambiguously express Congressional intent, *id.* at 842-843, the Court proceeds to the second step of the *Chevron* analysis. *Id.* at 843.

agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.")

## V.  CONCLUSION

For the reasons stated above, the Court will grant the Federal Defendants' motion for summary judgment [Dkt. # 57].  Plaintiffs' motion for summary judgment [Dkt. # 60] will be denied and Intervenor-Defendant's motion for summary judgment [Dkt. # 62] will be denied as moot.  A memorializing Order accompanies this Memorandum Opinion.

Date:   May 27, 2010

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge